1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  CEONA ASHLEY HARVEY,                    1:10-cv-00658-AWI-DLB HC

10                     Petitioner,         FINDINGS AND RECOMMENDATION
                                           REGARDING PETITION FOR WRIT OF
11       v.                                HABEAS CORPUS

12                                         [Doc. 1]
     JAVIER CAVAZOS, Warden
13
                       Respondent.
14  _____/

15
16       Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant

17  to 28 U.S.C. § 2254.[1]  Petitioner is represented by Danny D. Brace, Jr., Esq.

18                                  BACKGROUND

19       Following a jury trial in the Fresno County Superior Court, Petitioner was convicted of

20  first degree murder.  Petitioner was sentenced to life without the possibility of parole, plus four

21  years.

22       On October 3, 2008, the California Court of Appeal for the Fifth Appellate District

23  affirmed the judgment.  The California Supreme Court denied review.

24       Petitioner filed the instant federal petition for writ of habeas corpus on April 14, 2010.

25  Respondent filed an answer to the petition on August 3, 2010.  Petitioner did not file a traverse.

26

27       [1] Respondent's counsel submits that Javier Cavazos is the current Warden of Central California Women's
     Facility, not Mary Lattimore.  Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court
28  hereby substitutes Warden Cavazos in place of former Warden Lattimore.

                                        1

<u>STATEMENT OF FACTS</u>[2]

Veronica and Sebastian Caradonna lived in Northeast Fresno in a home with their two young children. Since 1997, they ran All Scrub Cleaning, a cleaning business, from their home. Employees would arrive at the Caradonnas' home after 10 p.m. in the evening to load up the company van, pick up supplies, and receive directions from Sebastian as to what they were to do that evening. When they arrived, Sebastian would open the garage door and give them their instructions.

Employees were paid in cash every other week. On payday their money was placed in an envelope and handed to them at the end of their shift. The Caradonnas were in the process of changing their system of payment to paying their employees by check; issuance of checks to employees was to begin on February 5, 2006.

Defendant was hired by Sebastian as an employee of All Scrub Cleaning and worked for the business from January 5 to January 13, 2006. After working for one week, defendant did not show up for her shift for the beginning of the next week. Defendant told Veronica that she had told Sebastian that she was going to Las Vegas and needed time off from work. Veronica talked to defendant on Monday and told defendant that if she took time off she needed to request time off in advance. Defendant told Veronica she was not going to come to work anymore. Defendant came to the Caradonnas' home to get paid and to turn in her work clothes. She came into the house and looked around a little bit. She was paid in cash and left.

At approximately 10 p.m. on the evening of February 1, 2006, Ramon Torres picked up Paul Mendez and Ruben Perez in the All Scrub Cleaning van and drove to the Caradonna residence to collect their supplies and get instructions so they could begin their shift. As they approached the home, Torres noticed a white car with shiny 20-inch rims parked nearby (exhibit 47, photograph of car). He had never seen it parked there before.

Mendez talked to Sebastian in the garage and then joined Perez and Torres while they loaded the van. Sebastian returned to go inside his home. Two men dressed all in black with their faces covered came up to the van. The taller of the two men (Derrick Hill) had a long rifle-type gun; the shorter man had a black handgun. The taller man pointed his weapon at Mendez and Perez, and told them to hurry up and go. He grabbed them and shoved them into the garage. The shorter man pulled Torres out of the driver's side of the van and shoved him to the door of the house.

Mendez opened the door in the garage that went into the house. Sebastian approached as the group entered the house. He looked scared. The shorter man grabbed Veronica. The taller man pushed Sebastian against the wall and pointed a gun to his face. The men demanded money. Mendez, Perez, and Torres were

---

[2] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District in <u>People v. Harvey</u>, No. F06902765-7, 2008 WL 4446530 *1-5 (Cal. App. 5th Dist.)  The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

forced to the center of the family room. The assailant demanded that Veronica obtain shoelaces and told her "we know you have children in the house." Veronica found shoelaces and handed them to the taller man.

Perez and Mendez had their hands tied behind their backs and were forced to lie on the floor face down. Torres had a broken arm that was in a cast, so he was allowed to lie with his face in the couch. The shorter man went through the employees' wallets, but they did not have money because they were not getting paid until the next day.

The two assailants repeatedly asked Veronica and Sebastian where the money was and where the safe was. They both continued to tell the assailants they did not have money in the house and did not have a safe. The shorter man said he knew they had money in the house and a safe in the house because they had been watching them for six months. Veronica asked the men not to do anything because her children were in the house. The men told her that if she did not give them what they wanted they were going to kill her children.

The taller man took Veronica to the bedroom and searched the closet. He kept asking for the safe. The man found Sebastian's gun case. He took it out into the living room and the men removed the guns. The taller man took Veronica back to the closet two times and kept demanding money and asking where the safe was.

Sebastian offered them Veronica's wedding rings and the personal identification number (PIN) to his bank card. They took the rings after Veronica retrieved them from her purse. The assailants got angry and said they were not going to fall for Sebastian's offer of his PIN number because it would be stupid of them to go to the bank where there are cameras.

Sebastian told the assailants he had money in the garage. Sebastian signaled to Veronica with his eyes and the men forced him into the garage. While the men were in the garage, Veronica dialed 911 and then stepped away from the telephone.

When they returned from the garage, the assailants were angry because there was no money in the garage. They became more aggressive and demanding. They told Sebastian that if he did not give them the money they were going to shoot him in the leg. The shorter man said he was going to kill all of them one by one, starting with the children, if Sebastian did not give them the money. The shorter man stood over the Caradonnas' sleeping daughter with his gun. Veronica pleaded with him not to hurt her daughter. At this point, Sebastian was kneeling by the sliding glass door. He again signaled to Veronica and shots were fired. Sebastian fell to the ground.

The assailants got jumpy. Veronica told them to leave. The smaller man looked out the window. As the assailants tried to exit the front door, the door got stuck. Veronica opened the door and let the men out. The men took the guns they had removed from the gun case. Veronica then locked the door. She was screaming as Sebastian was on the ground mortally wounded. Mendez ran through the house

and checked on the children.

Veronica kept screaming her neighbor's name. Her neighbor, a Fresno police officer, heard Veronica's screams. He got his gun and ran to the Caradonnas' front door. Torres unlocked the door and the neighbor entered. Veronica said they had shot Sebastian. The neighbor found Sebastian in a pool of blood. He was still breathing but eventually died.

Sebastian died from two gunshot wounds, one to his lower chest and another to his right shoulder. In addition, he had a laceration to his upper lip consistent with a blow by a handgun.

Mendez, Perez and Torres were questioned by police that night and in the days that followed. Mendez told police that when he worked with defendant, she asked him if Sebastian had money. Defendant told Mendez that she had friends that did home invasions. Defendant asked Mendez if Sebastian had a safe. Mendez said he did not know. This conversation made him uncomfortable. Mendez said that prior to this incident he was paid in cash in an envelope on Thursday nights every other week.

Perez testified that he worked with defendant while she was employed by All Scrub Cleaning. Defendant wanted to know if Sebastian had a safe and how much money he held. Perez told defendant he did not know. Defendant asked Perez if Sebastian had a bank account or if he kept his money at the house. Again Perez told defendant he did not know. Defendant started talking to Perez about "licks," a slang term for home invasions. Defendant asked Perez if he had ever done licks before. Defendant told Perez she knew people who had done licks and she had done a couple herself. She said one time she was the driver and another time she was the person who grabbed the money. Defendant also told Perez that she would let people know how many people would be inside a house, where the safe was, and how much money was present in the house. Perez told defendant he thought that the Caradonnas made a lot of money.

Antoinette Carrasco was defendant's friend. She was with defendant the entire morning of February 1, 2006. They drove around and defendant showed Carrasco where she was moving with Carrasco's sister. Defendant and Carrasco's sister were in a lesbian relationship that Carrasco did not approve of. Carrasco was with defendant until about 4:30 p.m.

Carrasco and defendant were at Carrasco's home when Derrick Hill came over. Defendant said that Hill was outside and wanted to "holler at" Carrasco. Carrasco peeked outside the window and saw Hill in his car (a white Chrysler Sebring, depicted in photographic exhibit 47 at trial). Defendant had previously talked about Hill and said he was her "right-hand man" and her "homeboy."

Carrasco testified that when she worked at Jack in the Box in July of 2005 defendant asked her if she would leave the back door open so her "homeboy" could come in and rob the place. Defendant explained the plan: Hill would come in, hit Carrasco over the head without hurting her, and rob the establishment.

Carrasco told defendant, "Hell no."

Carrasco admitted she had been convicted of felony grand theft in 2002. She stated that her conviction arose when she was working at K-mart and she was giving merchandise away without charging customers for it.

Marcelino Caudillo worked for All Scrub Cleaning. Defendant had given Caudillo a ride, but the two had not worked together. Defendant saw Caudillo get paid and saw that she (Caudillo) had over $1,000 in her wallet.

Jim Cook, an expert on cellular telephones, testified how cellular telephones react with cellular telephone towers. He testified that when a person uses their cellular telephone the telephone call will be placed through the nearest tower as long as that tower has sufficient room and capacity at the time the telephone call is made.

Carol Hinojosa, the customer operations manager for Cricket Communications, brought in the telephone records of defendant and Derrick Hill. Between January 20 and January 31, 2006, there were 15 calls made between the two of them. The last in this series of calls was made the night before the murder, on January 31, 2006 at 10:17 p.m. The call lasted two minutes and 21 seconds. This call originated from Hill's telephone and bounced off of Cricket Communications cellular telephone tower No. 2444. Tower No. 2444 was the tower closest to the residence of the victims.

On the day of the murder there was a series of six telephone calls between defendant and Hill, beginning in the afternoon and ending at 6:10 p.m. On February 2, 2006, the day following the murder, Hill and defendant spoke by telephone to each other six times, with one telephone call lasting over an hour. There were four more calls on February 3, 2006, and one on February 4, 2006, between Hill and defendant.

Defendant agreed to come to the police station on February 5, 2006, and was interviewed by Fresno police detective Eppifino Cardenas. A tape of this interview was played at trial. Defendant told Cardenas that she had worked at All Scrub Cleaning for one week beginning January 5, 2006. She said all of the employees were paid in cash, but the Caradonnas were switching to checks. She knew they were switching to checks because she had to fill out forms for the switch.

Defendant denied having any knowledge about the robbery or murder. She said that she was moving into her apartment with Mary Brown on the evening of February 1, 2006. At approximately 10 p.m. that night defendant went to Food Max. She told Cardenas that she had heard of the term "licks" while listening to rap music. She told Cardenas that she did not tell anyone that the Caradonnas had money in their house. Defendant was allowed to leave after this interview.

Fresno police detective Brad Alcorn was assigned the murder case from Cardenas on March 23, 2006. On April 13, 2006, Alcorn sent two detectives to meet defendant in the parking lot of her workplace after she got off work. The

detectives asked defendant if she would agree to be interviewed. She agreed and drove her car to the police station.

Prior to interviewing defendant, Alcorn made a detailed examination of her cellular telephone records. He was most interested in the call on January 31, 2006, from Hill to defendant placed the night before the murder at 10:17 p.m. that bounced off tower No. 2444. At the time of the interview Alcorn was operating under the mistaken belief that the call was received by defendant's cellular telephone off of tower No. 2444 also. That would place defendant and Hill in the neighborhood of the murder the night before the murder, at the time of night when the employees would be arriving at the Caradonnas' home. Alcorn did not learn until after the interview that defendant received the call from a cellular telephone tower in another neighborhood, far from the crime scene.

At the beginning of the interview, defendant was asked about her relationship with Hill. She said he had been around her family for awhile and he used to try to hit on her. Alcorn focused his interview on the evening of January 31, 2006, and kept asking defendant where she was. Alcorn accused defendant of being near the Caradonnas' home at the time of the call. Defendant continued to deny being in the area. Alcorn continued to question her about her location on January 31, 2006, and told her he had records that placed her in that area at the time of the 10 p.m. call. Defendant continued to deny being in the area, Alcorn kept pushing her, and eventually defendant said she probably was with Hill by the Caradonnas' home that evening.

She then said that she rode in Hill's truck and drove by the Caradonnas' home. She took Hill there because Hill told her he was going to follow her there anyway. Defendant told Alcorn she was afraid to ask Hill why he wanted to know where she worked. Defendant said that Hill asked her if Sebastian had money and if he had a safe. Defendant told Hill she was paid in cash when she worked for All Scrub Cleaning.

Defendant spoke to Hill the day after the murder. He told her the robbery did not happen. Hill told defendant he did not shoot anyone. Hill was with another person the next day when Hill came to talk to defendant. Defendant could not see the other person's face. Hill told defendant, "your job is whacked." Hill told defendant that Sebastian tried to run and the other guy shot him. Defendant said that Hill told her they did not get any jewelry or anything else. Defendant was allowed to leave after the interview but was arrested later that week.

A white Chrysler belonging to the mother of Hill's child was searched. Officers found a revolver hidden behind the headlight. It contained six live rounds. It was stipulated that the DNA found on the gun grip belonged to Hill. A vehicle belonging to Hill was searched. Officers found gloves inside this vehicle. Alcorn testified that the gloves were large and would fit Hill.

///
///
///

6

DISCUSSION

A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000). Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. at 785 (citing 28 U.S.C. § 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent. Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011). "A state court's determination that a claim lacks merits precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an

1   explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

2   basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

3   C.      Ineffective Assistance of Counsel Claims

4           Petitioner contends that trial counsel was ineffective for failing to: (1) move to suppress

5   Petitioner's second police interview; (2) object to all evidence pertaining to Petitioner's financial

6   situation; (3) object to the prosecutor's argument that Petitioner had a financial motive to commit

7   robbery; and (4) impeach witness Carrasco with a prior misdemeanor conviction.  Petitioner

8   raised these claims on direct appeal, and the California Court of Appeal issued the last reasoned

9   decision rejecting the claims.  The Court will address each sub-claim separately.

10          The law governing ineffective assistance of counsel claims is clearly established for the

11  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

12  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

13  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

14  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

15  the petitioner must show that counsel's performance was deficient, requiring a showing that

16  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

17  the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

18  representation fell below an objective standard of reasonableness, and must identify counsel's

19  alleged acts or omissions that were not the result of reasonable professional judgment

20  considering the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

21  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

22  indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

23  professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

24  Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

25

26          Second, the petitioner must show that counsel's errors were so egregious as to deprive

27  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

28  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail. Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

1.    Failure to Move to Suppress Petitioner's Second Police Interview

The California Court of Appeal denied the claim, stating in pertinent part:

> Defendant contends her counsel was ineffective in failing to move to suppress her April 13, 2006, interview with Detective Alcorn. She claims that her interview was psychologically coerced. She argues that the psychological coercion arose from false promises she would not go to jail, repeated false statements from Alcorn that her telephone records placed her at the crime scene the night before the crime, and statements implying that she had no liability if she was not present during the crime. Defendant asserts that if a motion had been made to suppress the statement it would have been granted, and there was no tactical reason for not moving to suppress the statement.

> Defendant argues that there could not have been a tactical reason for not objecting to the second interview because the statement was extremely harmful to her and it was the linchpin in the prosecution's case against her. We disagree.

> During the cross-examination of Alcorn, defense counsel focused repeatedly on the fact that Alcorn confronted defendant with information about the January 31 telephone call, which at the time Alcorn believed was true, and defendant eventually agreed with Alcorn's version of the events (that defendant was in the area of the Caradonnas' home the night before), even though it was not true. Defense counsel peppered Alcorn with his statements during the interview that he would protect defendant and she should trust him, yet Hill was not arrested until after defendant was arrested, and she was arrested two days after the interview. Defense counsel's questions focused on defendant's answers that she was afraid of Hill and that he knew where she lived. Defense counsel questioned Alcorn on whether it made sense that defendant said Hill told her he was going to

10

follow her to work so she took him to the Caradonnas', when in fact on January 31 she was no longer working for the Caradonnas. Defense counsel asked Alcorn about defendant's statements that she was afraid of Hill. Alcorn agreed that he asked defendant about the telephone call over and over again, he kept coming back to the telephone call during the interview, and he repeatedly told defendant he knew it was true that she was in the crime area the night before the murder using her cellular telephone. Defendant utilized Alcorn's mistaken belief during the interview as powerful evidence that what he strongly believed to be the truth turned out not to be the truth. Defense counsel artfully pointed out that during the interview Alcorn believed defendant when she told him things that were damaging to her, including that she was near the Caradonnas' on her cellular telephone the night before the murder, which was not true, and disbelieved defendant's statements that did not fit Alcorn's version of what he believed happened.

Thus, defense counsel's cross examination of Alcorn regarding defendant's interview with him accomplished more than one objective. It was a means to get defendant's version of what happened before the jury without having to put defendant on the stand, it showed that defendant gave in to Alcorn on facts that were not true, and it showed that Alcorn staunchly defended the facts as he believed them to be.

We have reviewed the transcript of the interview between Alcorn and defendant. It certainly contains evidence that could be beneficial to defendant.

In addition, defense counsel utilized the interview as the theme of his opening statement to the jury and his closing argument to the jury. Defense counsel began his closing argument by stating that assumptions have played an important part in this case. He began with the false assumption by Alcorn that on January 31 defendant made a telephone call while in the area of the Caradonnas' home. The bulk of defense counsel's argument was based on the interview with Alcorn. Counsel argued that Alcorn brought up the telephone call over 20 times. He believed defendant when what she said supported his theory, but disbelieved her when it did not support his theory. Defense counsel pointed out that Alcorn was able to get defendant to admit things that simply were not true. Defense counsel utilized the interview throughout his closing argument. Defense counsel also stated that for tactical reasons he wanted the transcripts of the interviews to go into the jury room during deliberations.

Defendant has failed to show that defense counsel did not make a reasonable tactical decision when he did not move to suppress the April 13, 2006, interview.

(Opinion, at *6-7.)

In order to determine whether Petitioner's counsel's decision was reasonable, the Court must examine the strength of a motion to suppress on the bases alleged by Petitioner. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999). Specifically, in order to demonstrate

prejudice, Petitioner must demonstrate that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to Petitioner. Id.

Based on the fact that defense counsel extensively cross-examined detective Alcorn regarding his second interview of Petitioner, there is simply no showing that counsel was ineffective or prejudiced by the failure to move to suppress this evidence.  Defense counsel made the strategical decision to challenge the interview by pointing out potential defects. Petitioner has not overcome the presumption that under these circumstances counsel's decision was neither reasonable nor sound trial strategy.  Strickland, 466 U.S. at 689; Murtishaw v. Woodford, 255 F.3d 926, 939 (9th Cir. 2001).  Accordingly, Petitioner's claim is without merit, and there is no basis for relief on this claim and it must be denied.

     2.     Failure to Object to All Evidence Relating to Petitioner's Finances and to Prosecutor's Argument that Petitioner Had a Financial Motive to Commit Robbery

Petitioner contends that counsel should have objected to the evidence relating to her finances as the motive for committing the robbery.

The California Court of Appeal denied the claim stating in pertinent part:

Prior to trial defense counsel objected to the admission of information in defendant's first interview regarding how much money she was getting from welfare, her unemployment money, and that she was living in Section 8 housing (a housing assistance program for low-income people). The objection was one of relevance and that the probative value outweighed the prejudicial effect. The People argued the evidence was relevant as to motive to show that defendant had a need for money.

The court ruled that the probative value of this evidence was outweighed by undue prejudice.

Although defense counsel sought to exclude certain financial information from the first interview, he did not seek to exclude additional financial information also contained in this interview. For example, during the interview defendant stated that her last job was at Jiffy Lube from May of 2005 until October of 2005. She did work at All Scrub Cleaning in January of 2006 for about a week. Later in the interview defendant stated that one of the reasons she left All Scrub Cleaning was because it was no longer going to pay her in cash and was going to start taking deductions from her pay. She said she had a car loan she needed to pay. Later on during the interview, defendant stated that she gave about $80 a month for rent to

her girlfriend, she had a car payment to make, and she had a car insurance payment to make each month. When asked how she could afford to live on that, she said that her father, who receives unemployment, helps her out. She followed this by saying she was currently trying to get a full-time job anywhere.

During closing arguments the People argued that defendant had a motive and her motive was one of economic need. The prosecutor argued that defendant was unemployed; was desperate for a job; and had a car payment, an insurance payment, and a rent payment to her girlfriend. The prosecutor argued that it was not believable that defendant got money from her father because he, too, was on unemployment. There was no objection to this portion of the prosecutor's argument.

"Generally, evidence of a defendant's poverty or indebtedness is inadmissible to establish a motive to commit robbery or theft, 'because reliance on poverty alone as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered outweighed by the risk of prejudice.' [Citation.]" (*People v. McDermott* (2002) 28 Cal.4th 946, 999.)

Defendant claims her counsel was ineffective in failing to object to all of the evidence relating to defendant's financial condition; the prosecutor was able to exploit the evidence in closing argument. She argues this evidence was equally, if not more, damaging to her than the evidence to which counsel did object. As an additional claim of ineffectiveness, defendant argues that her counsel erred in failing to object to the prosecutor's improper argument that defendant had a motive to commit the robbery based on her financial need.

Respondent concedes that defense counsel's failure to obtain a complete redaction of the inadmissible evidence and failure to object to the prosecutor's use of that evidence in closing argument constituted deficient performance by defense counsel. However, respondent argues that any error was not prejudicial.

We need not determine if respondent's concession of error is correct because we agree with respondent that error, if any, was not so prejudicial that reversal is required. The erroneous introduction of evidence is evaluated under the *Watson* (*People v. Watson* (1956) 46 Cal.2d 818, 836) standard. We will reverse only if it is reasonably probable the defendant would have obtained a more favorable result had the evidence been excluded. (*People v. Cooper* (1991) 53 Cal.3d 771, 836.)

At the time of her second interview, defendant was working at a hospital and had started her own cleaning service. Alcorn acknowledged that defendant's history was that she worked hard. Because of the nature of this case, the jury was well aware that defendant worked for only one week at All Scrub Cleaning and quit for personal reasons, not because she had another job. Thus, the jury was properly aware of some of defendant's work history.

Although the jury was instructed that it could consider whether defendant had a motive, the jury was also told that the People are not required to prove that defendant had a motive to commit any of the charged crimes. "Motive describes

the reason a person chooses to commit a crime." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)

> We think the circumstances of this case point to a motive of opportunity to obtain money easily from marked victims, not one of desperation by the defendant to obtain money due to her poverty. While working at All Scrub Cleaning, defendant questioned Perez about how much money Sebastian had in the house and where the safe was; this was during the time that defendant was working and presumably not in need of money. She told Perez that she knew people who did "licks." She tried to set up a robbery of a Jack in the Box. This evidence all pointed to a motive by defendant of garnering money in an easy fashion. It was the lure of easy money, not the need for money, that was central to the case here. These conversations by defendant were much more damaging to her case than any improper evidence of her financial condition and/or improper motive argument by the prosecution. Error, if any was harmless.

(Opinion at *7-9.)

Even if it is assumed that counsel was ineffective for failing to challenge the admission of Petitioner's financial status during the second interview with officer Alcorn, for the reasons explained by the state appellate court, there is no resulting prejudice.[3]  In this instance, it was undisputed that Petitioner worked for the Caradonna's for the week of January 5 to January 13, 2006 and voluntarily quit.  The evidence supports the finding that Petitioner sought to rob the victims because they had a lot of money and it could be obtained easily.  The jury was presented with evidence that Petitioner questioned Perez about the Caradonna's finances, how and when the employees were paid, and if Sebastian had a safe in his home.  There was also evidence that Petitioner previously asked a friend if she and her homeboy could do a "lick" at the Jack in the Box restaurant where she worked.  The evidence strongly supports the finding that Petitioner's motive for the robbery was the desire to obtain a large amount of money easily, and the appellate court's determination was not an unreasonable application of the <u>Strickland</u> standard, nor an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254.

---

[3] "The law respecting the admission of evidence pertaining to the defendant's poverty is well established. Indeed., for over a century courts have recognized the potential unfairness of admitting such evidence.  (See *People v. Kelly* (1901) 132 Cal. 430, 431, 64 P. 563.)  In order to avoid that eventuality, the rule has developed that 'a defendant's poverty generally may not be admitted to prove a motive to commit a robbery or theft.... [citations]." <u>People v. Carrillo</u>, 119 Cal.App.4th 94, 101-102 (2004).

1

2       3.      Failure to Use Impeachment Evidence

3

4       Petitioner claims counsel was ineffective for failing to impeach witness Carrasco with a

5  prior misdemeanor conviction for grand theft.  This claim was raised on direct appeal to the

   California Court of Appeal, which rejected the claim as follows:
6

7              Prior to trial, the court considered the issue of what evidence would be
        allowed to impeach various witnesses.  Defense counsel stated that he believed he
8       would be entitled to cross-examine Carrasco on her felony theft case but not her
        misdemeanor conviction.  The district attorney agreed to defense counsel's
9       assessment of various impeachment issues.

10             The court then stated for the record that it found that counsel had
        appropriately agreed that the only impeachment allowed for Carrasco would be
11      the felony grand theft; the court stated it reached that decision for Carrasco and
        another witness based on matters of moral turpitude, remoteness in time, and
12      false aura of veracity.

13
               When Carrasco testified, she admitted during her direct examination that
14      she had a prior felony conviction for grand theft. When asked what that conviction
        involved she testified, "I worded at K-Mart and I was giving stuff away without
15      charging people."

16
               [Petitioner] now claims that her counsel was ineffective in not attempting
17      to impeach Carrasco with the misdemeanor grand theft conviction in addition to
        the felony grand theft conviction.  In particular, [Petitioner], argues that
18      impeaching Carrasco with the misdemeanor conviction in addition to the felony
        conviction would have shown that the felony theft was not just an isolated
19      incident of dishonesty. [Petitioner] concludes that the jury would not have
        credited Carrasco's testimony and the verdict would have been more favorable to
20      [Petitioner] if defense counsel had impeached Carrasco with two incidents instead
        of one.
21

22             We first note the record here is not sufficient to determine if the trial
        court's statement was legally correct when it found the issues of impeachment
23      were appropriately agreed to by counsel.  For this reason alone, the argument fails.

24
               In any event, even if we assume defense counsel could have impeached
25      Carrasco with the misdemeanor conviction as well as the felony conviction and
        did not have a tactical reason for not doing so, any error was harmless.  Carrasco
26      was sufficiently impeached with her felony conviction to call into question her
        honesty.  The felony was the more serious of the two convictions.  In addition, her
27      explanation of the factual basis for her conviction clearly implied that her actions
        were not one isolated instance of dishonesty; she gave away "stuff" to people.

28

> It is not reasonably probable that a result more favorable to [Petitioner] would have occurred if Carrasco had been additionally impeached with the misdemeanor conviction.

(Opinion at *11.)

As an initial matter, the record is insufficient to determine if Carrasco's misdemeanor conviction was subject to use for impeachment purposes.  Even if so, there is no showing of prejudice under <u>Strickland</u>, and the state court did not unreasonably reject Petitioner's claim of inadequate representation due to his failure to impeach Carrasco with the misdemeanor conviction.  First, Carrasco's testimony was not critical.  Second, Carrasco was effectively impeached with her prior felony conviction-the more serious of the two prior convictions.  Third, her testimony that she was giving away "stuff" implicated that it was a pattern of misconduct and not limited to a single isolated incident.  Thus, the state court reasonably determined that the misdemeanor conviction had little probative value on Carrasco's credibility, given that he was impeached with her felony conviction.  It is unlikely that the jury would have disregarded Carrasco's testimony any further based on a misdemeanor conviction.   Accordingly, there is no basis for relief.

D.    <u>Admission of 9-1-1 Tape</u>

Petitioner contends the trial court erroneously admitted the 9-1-1 tape under California Evidence Code section 352, resulting in a violation of his right to a fair trial under the Fourteenth Amendment.  The California Court of Appeal rejected the claim in the last reasoned decision stating:

> As previously set forth, during the home invasion robbery Veronica called 911 when the robbers momentarily left the room. She set the telephone on the counter, and the rest of the robbery, including the murder of Sebastian, was recorded. The People sought to play the tape of the call at trial. Defendant objected to the admission of the tape claiming it displayed pure raw emotion and was too prejudicial. The trial court deferred ruling on the motion to exclude the tape until near the close of the prosecution's case.

> After the witnesses testified, the district attorney said that the testimony from the many witnesses at the scene of the home invasion differed and the tape clarified what actually occurred. Defendant again objected under Evidence Code section 352 due to the pure raw emotion of the tape.

The court ruled that the tape could be played to the jury. It found that the tape was actual evidence of the crime, reflected the dynamics of the situation, reflected the statements that were made, and showed the essence of the crime itself.

Defendant renewed her objection to the playing of the tape just prior to when it was played. The court did not reconsider its earlier ruling. The tape was played. After the tape was played, defense counsel continued to voice his objection, including his statement that the predictable effect on the jury was prejudicial to defendant. The People said that the jury's conduct during the playing of the tape was appropriate.

Defendant contends the trial court erred in admitting the 911 tape and deprived her of the right to a fair trial. She argues that the 911 tape consists mainly of Veronica's hysteria during and after the robberies and murder of her husband. Defendant asserts the tape was highly inflammatory and disturbing in its emotional content and was bound to inflame the jury against her. Defendant argues the court should have at least stopped the tape as soon as the robbers left the home and should not have allowed the jury to hear Veronica's wails and screams after her husband was murdered and before emergency personnel arrived.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Under this section, "the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

We have been unable to find any published case in which a sound recording of an actual homicide has been played for the jury. Accordingly, we turn for guidance to cases involving the admission of victim, crime scene, and other pictures. These cases lead us to the conclusion that the trial court's ruling was well within the bounds of reason.

The California Supreme Court has " 'described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.] As [that court has] observed, victim photographs and other graphic items of evidence in murder cases always are disturbing. [Citation.]' [Citations.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) The prosecutor is not obligated to prove details of the crime solely from the testimony of live witnesses nor is it required to accept antiseptic stipulations regarding details of the crime. (*Id.* at pp. 16-17.)

In *People v. McDermott* (2002) 28 Cal.4th 946 a videotape of the crime scene of a murder was made by police officers shortly after they arrived at the scene of the murder. The defendant objected to the admission of the tape pursuant to Evidence Code section 352, claiming it was more prejudicial than probative. The tape was shortened, but was admitted into evidence. The tape showed views of the house where the murder took place and showed the victim's mutilated groin where his penis had been cut off. Very little blood could be seen on the tape. The court held that, "[a]lthough unpleasant, the image is not shocking. The trial court did not abuse its discretion in admitting the videotape. [Citation.]" (*Id.* at p. 998.)

We have listened to the tape, and find it to be not as startling as one might expect, given the subject matter. Although it undoubtedly was unpleasant and disturbing to jurors, it was not so emotional as to have impermissibly swayed them, especially in view of the gripping testimony of the numerous witnesses, particularly Veronica, as to what occurred in the Caradonna home the evening of February 1, 2006. Moreover, the tape was highly probative direct evidence of the crime; it set a completely accurate timetable for the events, including the escape of the two men and the arrival of Escalante, the victim's neighbor. The fact that defendant was not at the crime scene when the crimes occurred does not change this analysis, since her culpability was based in a substantial part on what occurred at the Caradonna residence. The People were required to prove their case and were not required to do so in an antiseptic fashion.

The trial court did not abuse its discretion when it allowed the jury to listen to the 911 tape.

(Opinion, at *9-11.)

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985). Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990). However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920. Habeas relief for an erroneous evidentiary ruling of constitutional dimension would only be available if the error had a "substantial and injurious

18

effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Indeed, the Ninth Circuit has recently noted,

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was that the state court's ruling was an "unreasonable application."

Holley v. Yarburough, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing Musladin, 549 U.S. at 77, 127 S.Ct. 649.); see also Harrington v. Richter, 131 S.Ct. at 785 ("Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000).)

"'Under [California] Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]' [Citation.]" People v. Lewis, 26 Cal.4th 334, 374-375 (2001). The jury "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or her] testimony at the hearing." Cal. Evid. Code § 780.

In this instance, the tape served to provide a time frame of the incidents occurring during the home-invasion robbery and resolved any discrepancies as to such by the eye witnesses testimonies.[4] While the tape recording undoubtedly contained unpleasant circumstances, it was the most probative evidence of what the eyewitnesses/victims observed, and only a limited

---

[4] The prosecutor noted the "witnesses recount things slightly different. One person will see it from one point of view, one will see it from another and in a different order. Portions of this 911 tape that the People are seeking to play explain to some extent the order. They give the responses as demands are made. They explain what the victim and his wife were doing and give it in that order. And give their testimonies context as to the events that occurred to them. That is how it is relevant. It is the direct evidence of what occurred. (RT 335-336.) The prosecutor also clarified that some of the witness' testimony contradicted one another. (RT 336.)

portion of the recording was actually played for the jury.[5]  There is no showing that admission of the 911 tape recording resulted in a due process violation.  Even if it was error to admit the tape recording, there is no showing of prejudice.  The jury was instructed twice, once at the beginning of trial and once at the end, that they must not let sympathy or prejudice influence their decision. (RT 508, 1511.)  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (stating jurors are presumed to follow the court's instructions).  Moreover, as explained in section E, *infra*, there was more than sufficient evidence to support Petitioner's conviction, and there is not a reasonable probability that the outcome would have been more favorable had the tape recording been excluded.  Thus**,** the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

E.      Insufficient Evidence to Support Murder Conviction

Petitioner claims there was insufficient evidence to support the finding that she was a major participant and acted with reckless indifference to human life.  The California Court of Appeal found there was sufficient evidence to support the finding, stating the following:

> Because defendant was not the actual killer, in order to find the special circumstance to be true the People were required to prove that she acted with the intent to kill or acted with a reckless indifference to human life and as a major participant. (Pen.Code, § 190.2, subds.(c) & (d).) The People conceded at trial that they had not proved that defendant acted with an intent to kill and do not argue otherwise on appeal.
>
> Defendant asserts the evidence is not sufficient to prove that she was a major participant or acted with a reckless indifference to human life. She argues there was no evidence she did anything other than provide information to Hill with knowledge that Hill was likely to use it in some manner. She contends there is absolutely no evidence she subjectively appreciated that the perpetrators would do anything to endanger life. Defendant cites to and discusses a long list of cases where substantial evidence supported the special circumstance to demonstrate that her participation here was not substantial. In each of these cases the accomplices in some way participated in the actual commission of the robbery and were present at the scene.
>
> "In reviewing the sufficiency of the evidence to support a [special circumstance], we determine ' "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." [Citations.]' [Citation.] Under such standard, we review the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether

---

[5] The prosecutor only played five minutes of the twenty minute recording.  (RT 336.)

there is substantial direct or circumstantial evidence the defendant committed the charged crime. [Citations.] The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. [Citations.]

"In making the determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. [Citation.] We simply consider whether ' " *'any* rational trier of fact could have found the essential elements of [the special circumstance] beyond a reasonable doubt." ' [Citations.]' [Citation.] Unless it is clearly shown that 'on no hypotheses whatever is there sufficient substantial evidence to support the verdict' the [special circumstance] will not be reversed. [Citation.]" (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1161-1162.) "The term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' " (*People v. Proby* (1998) 60 Cal.App.4th 922, 928.) "As used in the term ' "major participant," ' the word ' "major" ' means ' "notable or conspicuous in effect or scope" ' or ' "one of the larger or more important members ... of a ... group." ' [Citation.]" (*People v. Smith* (2005) 135 Cal.App.4th 914, 928.)

In *People v. Hodgson* (2003) 111 Cal.App.4th 566, the appellate court summarized several cases that found substantial evidence to support the robbery-murder special circumstance finding when the defendant was not the actual killer. "[I]n *People v. Proby* the evidence established the defendant supplied the murder weapon to the actual killer; he was armed with a semiautomatic handgun; he saw 'pus' ooze out of the victim's head but did nothing to assist the victim; and helped his cohort take money and gift certificates out of the restaurant safe.

"Similarly, in *People v. Bustos* [(1994) 23 Cal.App.4th 1447] the defendant helped plan the robbery of a particular victim because they wanted to steal her car. He carried out his role in the plan by physically subduing the victim after she entered the public bathroom and by grabbing her purse. After his cohort fatally stabbed the victim twice, he fled with his accomplices and the robbery loot and left the victim to die.

"Also in *People v. Mora* [(1995) 39 Cal.App.4th 607], the evidence was sufficient to sustain the special circumstance finding. The defendant helped plan the robbery; was instrumental in arranging for his accomplice to enter the victim's home with a rifle; when his cohort shot the victim he carried through with the plan to steal; carried the loot away; and left the victim to die.

"In *Tison v. Arizona* [(1987) 481 U.S. 137] the United States Supreme Court held the Eighth Amendment did not prohibit a death sentence for a major participant in a felony which results in murder and whose mental state is one of reckless indifference to human life. In *Tison,* the defendants with the help of others planned and carried out the escape of their father from prison where he was serving a life sentence for having killed a guard during a previous escape. The defendants entered the prison with an ice chest full of guns, armed their father and another convicted murderer, later helped to abduct, detain and rob a family of four, and then stood by and watched their father and the other convict murder the family members. The defendants made no attempt to help the victims, but drove away in the victims' car with the others." (*People v. Hodgson, supra,* 111 Cal.App.4th at pp. 579-580, fns. omitted.)

In *Hodgson,* the court found that the evidence of the defendant's involvement was not as extensive as the cases it had summarized, yet it found the evidence was sufficient to uphold the special circumstance. The defendant in *Hodgson* "held open the electric gate of an underground parking garage of an apartment complex to facilitate the escape of his fellow gang member who had robbed and shot to death a woman just after she opened the gate with her key card." (*People v. Hodgson, supra,* 111 Cal.App.4th at p. 568.)

The appellate court found that the defendant was a major participant even though he did not supply the gun, was not armed, and did not personally take the property. "To begin with, this is not a crime committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus, appellant's role was more 'notable and conspicuous'-and also more essential-than if the shooter had been assisted by a coterie of confederates. By slowing down the closing automatic electric garage gate appellant was instrumental in assisting Salazar effect his escape with the loot. From their actions it appears appellant and Salazar believed the garage gate was the only access route for their escape. The evidence showed appellant used the full force of his body to try to keep the gate from closing until Salazar had accomplished the robbery and secured the loot. When the gate became dangerously close to closing appellant yelled a warning to Salazar and got out of his way to permit Salazar to exit. Appellant's actions suggest he believed Salazar would have been trapped inside the garage with his victim unless he acted to prevent the gate from closing. The fact police later discovered a low wall over which someone could have climbed to reach the street does not alter the men's own perception of the roles each had to play. Because appellant was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect." (*People v. Hodgson, supra,* 111 Cal.App.4th at pp. 579-580.)

In addition, the *Hodgson* court found that the defendant acted with reckless indifference to human life. The court stated that defendant must have been aware that the use of a gun during a robbery presents a grave risk of death. After the victim was first shot, the defendant did not aid the victim but instead chose to assist his fellow gang member to escape. (*People v. Hodgson, supra,* 111 Cal.App.4th at p. 580.)

There is nothing in Penal Code section 190.2, subdivision (d) requiring that a defendant be present at the scene of the crime before the special circumstance can be found true. Considering the evidence in the light most favorable to the judgment, the following facts were shown by the evidence. Defendant supplied all of the information to Hill to set up the home invasion robbery and was instrumental in gathering the intelligence for the robbery. She knew that Hill carried a weapon with him. She told others that she had participated in and or set up previous "licks." She was in repeated contact with Hill in the days leading up to the robbery and had a telephone call from him while he was in the neighborhood of the Caradonnas' home the night before the robbery at the same time the robbery occurred the next day. These factors demonstrate that defendant was a notable and important member of the group and was thus a major participant.

Defendant knew that there would be several employees present at the time of the planned robbery, in addition to the Caradonnas. With that many people present it was absolutely clear that a show of force would be necessary in order to effectuate a robbery. She knew that the robbers would enter the home, and that Hill would be armed, a situation rife with opportunities for a violent reaction by the intruders

1

2
or those present in the home. Such a scenario presents a grave risk of death and
satisfied the requirement that defendant acted with reckless indifference to human
life.

3

4
(Opinion at *11-14.)

5
        There was sufficient evidence that Petitioner participated in the plan to rob the

6
Caradonna's residence while they were home and acted with reckless indifference to human life.

7
While Petitioner was employed for the Caradonna's window cleaning business, she asked two

8
fellow employees of the Caradonna's business if the Sebastian had money and told them she had

9
friends who did home invasions.  She also asked if Sebastian Caradonna had a safe.  Petitioner

10
also asked Perez if Sebastian kept his money in a bank account or in his home.  Petitioner told

11
Perez that she knew people who had done "licks"-a slang term for home invasions, and she had

12
done a couple herself-once as the driver and another when she grabbed the money.  Petitioner

13
asked Perez if he knew how many people would be in the home, the location of the safe, and how

14
much money was in the home.  Perez responded that he believed the Caradonnas made a lot of

15
money.  Petitioner referred to Hill as her "right-hand man" and her "homeboy."  Petitioner's

16
friend, Carrasco, testified to a prior incident in which Petitioner asked if she and her "homeboy"

17
could rob the Jack in the Box restaurant where she was employed, but Carrasco did not agree.  In

18
addition, Petitioner had several telephone conversations with Hill just prior to the incident,

19
including a telephone call to Hill the night before while he was in the Caradonna's neighborhood.

20
Moreover, Petitioner was obviously aware of the danger to human life, as she knew Hill was

21
carrying a loaded gun and that several employees would be present at the time of the robbery

22
increasing the likelihood of requiring force resulting in violence.  Viewing these circumstances in

23
the light most favorable to the prosecution, there is sufficient evidence to support the finding that

24
Petitioner was a major participant in the commission of the robbery and acted with reckless

25
disregard for human life, and the state courts' determination of this issue was not contrary to, or

26
an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. §

27
2254(d).

28

1   F.      Sentencing Error

2           Petitioner contends the trial court erroneously failed to state its reasons for imposing an

3   indeterminate term consecutively to a determinate term, and the imposition of consecutive

4   sentences violated her Sixth and Fourteenth Amendment rights to a jury trial and proof beyond a

5   reasonable doubt.

6           The California Court of Appeal denied the claim in the last reasoned decision, stating:

7                   In count 1, [Petitioner] was sentenced to the term of life without the
            possibility of parole, to be served consecutively to the determinate term for the
8           robbery convictions, including her conviction for count 3 wherein Veronica was
            the victim.  The court did not explicitly state reasons for its imposition of the
9           consecutive sentences other than to say that the verdict of the jury compels and
            directs the sentence to be imposed.  The prosecutor had earlier asked that the court
10          impose the indeterminate sentence for the murder consecutive to the determinate
            sentence for the robbery conviction in count 3.

11
                    A trial court is required to give reasons for imposing an indeterminate term
12          consecutively to a determinate term.  (*People v. Dixon* (1993) 20 Cal.App.4th
            1029, 1036, 1037.)  Defense counsel failed to object when the trial court failed to
13          state reasons for imposing consecutive sentences.  His failure to object forfeits the
            issue on appeal.  (*People v. Scott* (1994) 9 Cal.4th 331, 353; *People v. Zuniga*
14          (1996) 46 Cal.App.4th 81, 84; *People v. Velasquez* (2007) 152 Cal.App.4th 1503,
            1511-1512.)

15

16          Petitioner's claim that the trial court violated his right to a jury trial by imposing

17  consecutive sentences without a finding of proof beyond a reasonable doubt, is foreclosed by the

18  Supreme Court's decision in Oregon v. Ice, 129 S.Ct. 711, 714-719 (2009).  There, the Supreme

19  Court held that the Sixth Amendment right to a jury trial does not attach to the decision to

20  impose consecutive sentences.  The Court reasoned that the decision to impose consecutive terms

21  was not historically a jury function, and the principles established in Apprendi, Blakely, and

22  Cunningham do not apply.  Id. at 714-715.  Accordingly, there is no basis for relief.

23                                   RECOMMENDATION

24          Based on the foregoing, it is HEREBY RECOMMENDED that:

25          1.      The instant petition for writ of habeas corpus be DENIED; and

26          2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

27          This Findings and Recommendation is submitted to the assigned United States District

28  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the

1  Local Rules of Practice for the United States District Court, Eastern District of California.

2  Within thirty (30) days after being served with a copy, any party may file written objections with

3  the court and serve a copy on all parties.  Such a document should be captioned "Objections to

4  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served

5  and filed within fourteen (14) days after service of the objections.  The Court will then review the

6  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that

7  failure to file objections within the specified time may waive the right to appeal the District

8  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9

10      IT IS SO ORDERED.

11      **Dated:**   **March 18, 2011**            **/s/ Dennis L. Beck**
                                        UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28